IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL INDICTMENT |
| | : | NO.: 2:16-CR-031-RWS-JCF |
| KECOLE DUKES, | : | |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATION

This case is before the Court on the Motion To Suppress Evidence filed by Defendant Kecole Dukes. (Doc. 29). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion be **DENIED**.

## Procedural History

An Indictment filed October 25, 2016 charges Defendant with conspiracy to possess with intent to distribute cocaine (Count One) and distribution of cocaine (Counts Two, Six, Nine). (Doc. 1). Defendant filed a motion to suppress evidence on January 15, 2017. (Doc. 29). On March 1, 2017, the Court conducted a hearing on Defendant's motions (*see* Docs. 38, 39, 41), and a transcript[1] of that hearing was filed on March 17, 2017 (Doc. 44). Defendant filed a post-hearing brief on April 28, 2017 (Doc. 52), the Government submitted a response on May 19, 2017 (Doc. 58), and Defendant filed a reply on June 27, 2017 (Doc. 64). With the

---

[1] References to that transcript will be designated as "Tr. __."

1

Court's permission, the Government filed a surreply on July 7, 2017 (Doc. 66), and Defendant responded to that surreply on July 14, 2017 (Doc. 68). With briefing now complete, the Court considers the merits of Defendant's motion.

## **Facts**[2]

Defendant was granted parole on July 30, 2014 to start August 6, 2014 and to end on February 20, 2017. (Tr. 14; Gov't Ex. 2). On August 6, 2014, Defendant signed a Parole Certificate acknowledging the standard conditions of parole, including Standard Condition 2 which provides in relevant part, "My parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control." (Tr. 15; Gov't Ex. 2). That condition is referred to as a Fourth Amendment waiver. (Tr. 18). Defendant and a parole officer signed a Parole Certificate on August 11, 2014 which contained the same conditions. (Tr. 16-17; Gov't Ex. 3). Christopher Ayers, Assistant Chief with the Georgia Department of Community Supervision[3], explained that that condition "relates to . . . continued public safety to ensure that

---

[2] These facts are taken from the testimony of Christopher Ayers, Assistant Chief with the Georgia Department of Community Supervision, Michael Fortener, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and James Nash, a Special Agent with the ATF (*see* Doc. 44), as well as the Government's exhibits admitted during the March 1, 2017 hearing (*see* Docs. 41-1 through 41-6).

[3] Approximately a year ago the Georgia Department of Corrections Probation Division merged with the Georgia Board of Pardons and Paroles to form the Georgia Department of Community Supervision, which supervises all Georgia probationers, felony probationers, and parolees. (Tr. 11-12).

no further crimes are being committed, and to . . . ensure that the offender is making a full commitment to reintegrate with the community[.]" (Tr. 18). Ayers also explained that the condition allows the search of "any property that the offender has control over, the time that we're interacting with that offender, any place where we know that offender to be residing, if they live in a room or if they live in a house, in that house, any common areas that the offender might have access to is . . . an area that offender would understand that we would have access to search as . . . this condition." (Tr. 18-19). By "common areas," Ayers means "a living room area, a kitchen, bathrooms that . . . branch off those common areas[.]." In addition, the Fourth Amendment waiver "follow[s] that offender wherever they go" because offenders are often not found at the residence address they provide to their parole officer, so officers need to be able to conduct searches wherever the offender is found. (Tr. 18-19).

The Department maintains procedures for conducting searches pursuant to the Fourth Amendment waiver. (Tr. 20; Gov't Ex. 4). Before a parole officer can perform a search pursuant to the Fourth Amendment waiver, he must be able to demonstrate or articulate some reasonable suspicion that there is criminal activity going on or contraband present where that individual is located or some violation of the terms and conditions of parole. (*Id*.). The officer is then required to notify a chief parole officer or designee, who would then provide authority to the parole

3

officer to conduct the search. (Tr. 21). Ayers testified that if a parole officer advised him that a parolee had been indicted on a federal drug charge, that information would provide reasonable suspicion to support a search of the parolee's premises or residence pursuant to the Department's policy. (Tr. 21).

On October 27, 2016, the undersigned issued a warrant for Defendant's arrest based on the above-referenced Indictment filed October 25, 2016. (Doc. 1; Gov't Ex. 1). Special Agent Michael Fortener with the Bureau of Alcohol, Tobacco, Firearms and Explosive ("ATF"), was the arrest team leader for a team assigned to arrest Defendant and another arrestee, Denson Porter, on November 2, 2016. (Tr. 29, 33, 42; Gov't Ex. 1). Other members of the team included other ATF agents, officers from the Gainesville Police Department, a Hall County investigator, and Jeffrey Rockfield, a probation officer, who "was there to assist with any Fourth Amendment waiver search issues that may come up." (Tr. 22, 31-32). As team leader, Agent Fortener conducted pre-arrest surveillance to verify addresses and vehicles for Defendant, briefed the members of his team, and coordinated their efforts. (Tr. 30).

The first address the team went to, 1030 Summit Street Apartment B9, was Defendant's mother's address. (Tr. 34, 43-44, 48). They did not see any vehicles associated with Defendant at that address. (Tr. 34). Defendant's mother informed the agents that he was not there, and she allowed the agents to look for him in her

4

apartment. (Tr. 35, 45-46). Fortener observed three other young men in the apartment sleeping, "and the apartment was pretty cluttered with stuff," but he did not determine if any of those items belonged to Defendant. (Tr. 46). Defendant's mother was "pretty incoherent," but she told the agents that Defendant was not there and she did not know where he was, but he could have been at a hotel with a girl. (Tr. 35-36, 46-47).

The agents then went to their second target, Mr. Porter, and arrested him. (Tr. 36, 48). They received information from members of the arrest team responsible for arresting Defendant's brother Kemeka Dukes that a source told them that Defendant was going to be at an apartment at another address, 1001 Parkhill Drive Apartment B2. (Tr. 36-37, 49-50). The arrest team then went to that apartment at approximately 7 a.m.[4] (Tr. 37; Gov't Ex. 4). They knocked on the apartment door and after a few minutes a young woman, Brittany Holcomb, answered.[5] (Tr. 38, 50-51). No lights were on, and Ms. Holcomb was dressed in a nightshirt or nightgown, so the agents assumed she had been asleep. (Tr. 51-52). They asked her if she knew where Defendant was, and "she pointed to a black male sleeping on the couch right inside the door and identified him as Kecole Dukes." (Tr. 39, 52). The agents woke up Defendant, searched the area where he

---

[4] The agents did not see Defendant's car there, but they later learned that it was at an auto repair shop. (Tr. 64).
[5] ATF Agent Nash was informed later that Ms. Holcomb was Defendant's girlfriend. (Tr. 69).

5

had been sleeping, placed him in handcuffs, and placed him under arrest. (Tr. 39, 53). They allowed him to get dressed and put on his shoes and then led him out of the apartment to a marked Gainesville police car. (Tr. 39). Agents cleared the apartment to make sure there were no other people in the apartment. (Tr. 39-40). The apartment was a small one-bedroom apartment that had a galley-type kitchen with a bar area that opened up to the living room area. (Tr. 60, 69). There were some personal effects, men's and women's clothes and shoes, and "some limited furniture" in the apartment. (Tr. 63). The apartment was "sparsely furnished" with very minimal belongings. (Tr. 76).

The agents then decided to conduct a search, coordinated by Probation Officer Rockfield, and Agent Fortener notified his command post they were going to perform a search. (Tr. 40). ATF Special Agent James Nash entered the apartment and observed Ms. Holcomb inside the apartment and unsecured in the living room area while Probation Officer Rockfield was in the kitchen area searching. (Tr. 69-70). Rockfield was looking in cabinets, drawers, cupboards, "normal places that you would look for things of contraband." (Tr. 70). Agent Nash photographed the items Rockfield found and asked the case agent, Special Agent Spence Burnett, if he "want[ed] those items." (Tr. 71-72; Gov't Ex. 5). The items he photographed included a small silver digital scale, a box of sandwich

6

bags, a razor blade inside of a small plastic bag, another small plastic bag, and some snack boxes. (Tr. 72, 75; Gov't Ex. 5).

Fortener and another agent spoke with Defendant while other agents conducted the search and took photographs. (Tr. 40). Fortener "wanted to make sure that he was aware that he was under arrest pursuant to a federal arrest warrant." (Tr. 53). Fortener asked Defendant if he had a cell phone, and he said no, but one was found where Defendant had been sleeping. (Tr. 41, 56). Fortener also talked to Ms. Holcomb, but he did not ask her whose apartment it was or whether she consented to the search. (Tr. 56, 59-60). Neither Agent Fortener or Nash knew if anyone present had keys to the apartment. (Tr. 64, 76). The search did not take long because the apartment was so small, and the agents were only on the scene for 30 to 45 minutes. (Tr. 63-64). After the search Fortener entered the apartment, saw the items that had been seized, and completed a Gainesville Police Department property inventory record to document the items that were seized, i.e., a cell phone and charger, a razor blade, a small digital scale, and a box of sandwich bags. (Tr. 41-42, 55-56; Gov't Ex. 6).

## **Discussion**

Defendant moves to suppress evidence seized without a warrant from the apartment where he was found sleeping on November 2, 2016. (*See generally* Docs. 29, 52). The Government contends that Defendant's motion should be

7

denied because he has not demonstrated that he has "standing" to challenge the search at issue, i.e., he has not shown that he had a legitimate expectation of privacy in the apartment where he was arrested. (Doc. 58 at 2). The Government argues further that even if Defendant could make such a showing, the search was lawful pursuant to Defendant's Fourth Amendment waiver as a standard condition of his parole. (*Id.*). In response, Defendant relies on *Minnesota v. Olson*, 495 U.S. 91 (1990) to contend that he has standing to contest the search because he was an overnight guest at the apartment. (Doc. 52 at 5-7; Doc. 64 at 1-3). He also argues that the Fourth Amendment waiver did not apply to this search because it was not a search of his "person, papers, and place of residence, automobile, or any other property under [his] control" as specified in the Fourth Amendment waiver.[6] (Doc. 52 at 7-11; Doc. 64 at 4-8; *see also* Doc. 41-1 at 2; Doc. 41-2 at 2).

**I.     Standing**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The 'ultimate touchstone of the Fourth Amendment is reasonableness.' " *United States v. Walker*, 799 F.3d 1361, 1363

---

[6] In his reply brief Defendant challenged the search on the ground that it was conducted by a probation officer, not a parole officer (*see* Doc. 64 at 7), but he has withdrawn that challenge (*see* Doc. 68).

(11th Cir. 2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Where a search and seizure occur without a warrant, the burden is on the Government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983). Before reaching the issue of whether an exception to the warrant requirement exists, however, the Court must determine whether Defendant has shown that he had a legitimate expectation in the area searched and therefore has standing to challenge the search and seizures at issue.

"The 'capacity to claim the protection of the Fourth Amendment depends on whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' " *United States v. Merricks*, 572 Fed. Appx. 753, 756 (11th Cir. 2014) (unpublished decision) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "Accordingly, a defendant has standing to challenge a search and seizure only if the defendant 'had a legitimate expectation of privacy in the property when it was searched.' " *Id.* (quoting *United States v. Gibson*, 708 F.3d 1256, 1276 (11th Cir. 2013)). "The defendant bears the burden of establishing a legitimate expectation of privacy in the area searched." *Id.* at 757. "Making this determination involves a two-part inquiry: (1) 'whether the individual has manifested "a subjective expectation of privacy in the object of the

9

challenged search[,]" . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate.' " *United States v. Vega-Cervantes*, No. 1:14-CR-00234-WSD-JFK, 2015 U.S. Dist. LEXIS 106602, at *18-19 (N.D. Ga. Apr. 17, 2015) (quoting *United States v. Hastamorir*, 881 F.2d 1551, 1559 (11th Cir. 1989)), *adopted by* 2015 U.S. Dist. LEXIS 106705 (N.D. Ga. Aug. 13, 2015).

"Courts assess on a case-by case basis the 'standing' of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control," as was the situation here. *United States v. Bendelladj*, No. 1:11-CR-557-AT-AJB, 2014 U.S. Dist. LEXIS 184100, at *14 (N.D. Ga. Dec. 29, 2014), *adopted by* 2015 U.S. Dist. LEXIS 75370 (N.D. Ga. June 10, 2015). "No one circumstance is talismanic to this inquiry." *Id.* And " '[w]hile property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry.' " *Id.* (quoting *United States v. Salvucci*, 448 U.S. 83, 92 (1980)). "Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether

he was legitimately on the premises." *Id.* at *14-15 (citing *United States v. Pitt*, 717 F.2d 1334, 1337 (11th Cir. 1983) and *United States v. Haydel*, 649 F.2d 1152, 1154-55 (5th Cir. 1981)). "To have an expectation of privacy in premises that he did not own or lease, a defendant must show 'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.' " *Id.* at *15 (quoting *United States v. Bushay*, 859 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012)) (internal quotation omitted)).

Defendant has not shown that he owned or rented the apartment where he was found, nor does he claim to have lived there. To the contrary, he disavows that the apartment was his residence. (*See* Doc. 52 at 9; Doc. 64 at 8). Instead, he contends that he has standing to challenge the search and seizures at issue because he was an overnight guest, citing the Supreme Court's decision in *Minnesota v. Olson*. (Doc. 52 at 5-7; Doc. 64 at 1-3). In that case, the Supreme Court held that an overnight guest has a legitimate expectation of privacy in his host's home. *Minnesota v. Olson*, 495 U.S. at 98-99.

One difficulty with Defendant's position is that the record does not indicated how long he had been in the apartment or show that he was an "*overnight* guest." Defendant relies on the fact that he was found sleeping on the couch on the

11

morning of November 2, 2016 (Doc. 52 at 6)[7], but that evidence does not show when he arrived there. Even if the Court assumes he arrived at least the night before, "the act of staying overnight at a third party residence does not automatically entitle a defendant to the protections of the Fourth Amendment." *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1341 (N.D. Ga. 2009) (internal quotation omitted). "Indeed, merely occupying a residence or room overnight does not establish a reasonable expectation of privacy in that place for Fourth Amendment purposes." *Id.* "Rather, a person claiming the protection of the Fourth Amendment in a third party's residence must prove that he was legitimately in the place searched." *Id.*

Here, Defendant has not presented or pointed to any evidence that shows that he was "legitimately in the place searched." Defendant refers to the apartment as "Ms. Holcomb's apartment" (Doc. 64 at 8), but he presented no evidence as to her relationship to the apartment, whether she owns or rents the apartment, resides there, or had the permission of the owner or renter to sleep there and to allow others to do likewise.[8] Nor did he present any evidence that Ms. Holcomb gave

---

[7] According to "operation notes" attached to one of the Government's exhibits, Defendant was arrested at 7 a.m. (Doc. 41-3 at 4).

[8] Defendant asserts that "[i]n the description of the apartment, it was clearly a place where Ms. Holcomb lived, and was not a commercial establishment or someplace where they were squatting." (Doc. 64 at 3). To the contrary, the agents described the apartment as sparsely or minimally furnished (Tr. 63, 76), and no evidence was

permission for him to be in the apartment. "The Supreme Court's recognition of privacy for an overnight guest depends on the concept that '[t]he houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest.' " *United States v. Hollis*, No. CR. NO. 3:12cr17-WKW, 2012 U.S. Dist. LEXIS 63778, at *8-9 (M.D. Ala. Apr. 11, 2012) (explaining that "[w]hile an overnight guest may evidence a legitimate expectation of privacy in the property where the guest stayed, Hollis must first establish that he was in the apartment with Howard's permission, engaging in a 'longstanding social custom that serves functions recognized as valuable by society . . . .' " (quoting *Olson*, 495 U.S. at 98-99)); *Rodriguez-Alejandro*, 664 F. Supp. 2d at 1343 (rejecting defendants' claim that they were overnight guests because "they presented no evidence that anyone with authority to do so gave them permission to stay as guests in the residence" and explaining that "[a]bsent evidence of an identifiable host who granted them permission to stay at the residence, defendants have not demonstrated that they were 'guests' "). And other than the fact that Defendant was found sleeping on the couch of the sparsely furnished apartment, no other evidence was presented concerning his relationship to the apartment, whether he stored any items there, the circumstances under which was present, or how long he had been there. Accordingly, the undersigned finds that Defendant has not met his

---

presented as to Ms. Holcomb's relationship to the apartment other than her presence there on the morning of November 2, 2016.

burden of establishing that he had a legitimate expectation of privacy in the apartment. *See, e.g.*, *Rodriguez-Alejandro*, 664 F. Supp. 2d at 1342 (finding that defendants had not satisfied their burden of showing that they had a legitimate expectation of privacy in residence where they were staying because they "were not the owners of the residence, presented no evidence that they had the permission of the owner to reside at the residence, and had no idea of how long they would be at the residence").

Furthermore, even if Defendant had shown that he was in fact an overnight guest at the apartment, that showing would doom his contention that the Fourth Amendment waiver did not authorize the search.

## II. <u>Fourth Amendment Waiver</u>

The Fourth Amendment waiver in this case, which Defendant signed as a standard condition of his parole, provides in relevant part, "My parole officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, *or any other property under my control*." (Doc. 41-1 at 2 (emphasis added)). In *Samson v. California*, 547 U.S. 843, 847 (2006), the Supreme Court considered "whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment" and answered that question in the affirmative. The Court

explained "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id.* at 850.

Defendant does not contest the search of his person or couch where he was sleeping and resulting seizure of his cell phone found there. (*See* 64 at 8). But he contends that the Fourth Amendment waiver did not authorize the search of the rest of the apartment, which resulted in the seizure of a razor blade, a small digital scale, and a box of sandwich bags (*see* Doc. 41-5), because those areas were not his "person, papers, and place of residence, automobile, or any property under [his] control." (Doc. 52 at 8-11; Doc. 64 at 5-8). Although it is not clear from which specific areas of the apartment the seized items were found, they would have come from the bedroom, the bathroom, the kitchen, and/or the living area. If, as Defendant contends, he was in fact an overnight guest in that apartment, then he also had "a measure of control over the premises," *Olson*, 495 U.S. at 99, and the Fourth Amendment waiver authorized the warrantless search and seizure of items from the apartment. The Court explained in *Olson*:

> That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with this guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises.

*Id.*

On the other hand, if—as Defendant asserts in challenging the Fourth Amendment waiver—he had no control over the areas where the seized items (other than his cell phone) were found, then he has not demonstrated a legitimate expectation of privacy in those areas. *See, e.g.*, *United States v. Cossio*, 336 Fed. Appx. 909, 912 (11th Cir. 2009) (finding that even if the court were to credit Cossio's testimony that he had standing as an overnight guest or caretaker of the property, he "failed to prove he had 'an unrestricted right of occupancy or custody and control of the premises' that would create a legitimate expectation of privacy in the area of the house where the marijuana was discovered' " and therefore lacked standing to challenge the search of the residence (quoting *United States v. Baron-Mantilla*, 742 F.2d 868, 870 (11th Cir. 1984)); *United States v. Laughlin*, No. 1:10-CR-113-TWT/AJB, 2012 U.S. Dist. LEXIS 104921, at *75 (N.D. Ga. July 6, 2012) ("Neither defendant demonstrated 'an unrestricted right of occupancy or custody and control of the premises' that would create a legitimate expectation of privacy in the residence."), *adopted by* 2012 U.S. Dist. LEXIS 104913 (N.D. Ga. July 27, 2012). Thus, regardless of whether or not Defendant was an overnight guest in the apartment where he was found, suppression of the items seized from that apartment is not required. Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress (Doc. 29) be **DENIED**.

**IT IS SO REPORTED AND RECOMMENDED** this <u>1st</u> day of <u>August</u>, 2017.

                                      <u>*/s/ J. CLAY FULLER*</u>
                                      J. CLAY FULLER
                                      United States Magistrate Judge